UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| LASHAWN LAMONT JOHNSON, | ) | |
|---|---|---|
| *Plaintiff*, | ) ) | Case No. 2:20-cv-99 |
| v. | ) ) | Judge Travis R. McDonough |
| | ) | Magistrate Judge Cynthia R. Wyrick |
| SGT. MCGINNIS, C.O. HARRIS, and C.O. TIPTON, | ) ) ) | |
| *Defendants*. | ) | |

## MEMORANDUM OPINION

Defendants McGinnis, Harris, and Tipton have filed motions for summary judgment in this pro se prisoner's civil rights action for violation of 42 U.S.C. § 1983 (Docs. 62, 64, 66). Plaintiff has filed various responses in opposition to the motions (Docs. 71, 72, 78, 80). Upon consideration of the parties' pleadings, the summary judgment evidence, and the applicable law, the Court finds that summary judgment should be **GRANTED** in favor of Defendants, the remaining motions (Doc. 83, 91, 92) should be **DENIED** as moot, and this action should be **DISMISSED WITH PREJUDICE**.

### I.  ALLEGATIONS OF COMPLAINT[1]

On December 4, 2019, Plaintiff, an inmate housed at the Carter County Detention Facility ("CCDF"), was written up on on disciplinary charges after allegedly disrespecting a female officer. (Doc. 17, at 3.) Later that same day, a sergeant came to Plaintiff's cell to move him to

---

[1] This Court allowed Plaintiff to proceed only on his claims of excessive force as to Officers Harris and Tipton and the denial of adequate medical treatment and the free exercise of his faith by Sergeant McGinnis. (Doc. 19, at 47.) Therefore, the Court confines its factual recitation to the allegations relevant to these claims.

lockdown, and Plaintiff refused to comply (*Id*. at 3–4.) Instead, Plaintiff turned to get back in bed when he was shot seven to twelve times by Correctional Officer ("C.O.") Harris. (*Id*. at 4.) Plaintiff maintains that C.O. Tipton "hit [him] in the face busting [his] lip after [he] was shot." (*Id*.) Plaintiff contends that Sgt. McGinnis thereafter ordered that Plaintiff be denied medical treatment. (*Id.* at 3)

Plaintiff also alleges that on December 10, 2019, Sgt. McGinnis ordered staff to take Plaintiff's Quran and prayer blanket, along with his other personal items, each day between 7:00 a.m. and 11:00 p.m. (*Id*. at 4–5.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper only when the pleadings and evidence, viewed in a light most favorable to the nonmoving party, illustrate that no genuine issue of material fact exists, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A fact is "material" if resolving that fact in favor of one party "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To establish entitlement to summary judgment, the moving party must demonstrate that the nonmoving party cannot establish an essential element of his case for which he bears the ultimate burden of proof at trial. *Celotex*, 477 U.S. at 323; *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993).

Once the movant properly supports his motion with competent evidence, the nonmovant must show that summary judgment is inappropriate by setting forth specific facts showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 323; *Anderson*, 477 U.S. at 249. If the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," a genuine dispute as to a material fact remains. *Anderson*, 477 U.S. at 248. But if a movant does not present opposing proof, the Court does not presume that he "could or would prove the

2

necessary facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan v. Nat'l Wildlife Fed'n.*, 497 U.S. 871, 888 (1990)).

The very purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine issue for trial." Fed. R. Civ. P. 56 advisory committee note to 1963 amendment. The applicable Rule "is not intended to derogate from the solemnity of the pleadings[;] [r]ather, it recognizes that despite the best efforts of counsel to make his pleadings accurate, they may be overwhelmingly contradicted by the proof available to his adversary." *Id.*

The non-moving party cannot support his burden of proof with "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), "conclusory allegations," *Lujan*, 497 U.S. at 888, or by a mere "scintilla" of evidence, *Anderson*, 477 U.S. at 252. It would undermine the purposes of summary judgment if a party could defeat such a motion simply by "replac[ing] conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan*, 497 U.S. at 888. Therefore, in considering a motion for summary judgment, a court must determine whether the non-moving party's allegations are *plausible*. *Matsushita*, 475 U.S. at 587 (emphasis added). An assessment of a claim's plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (discussing plausibility of claim as a requirement to survive a motion to dismiss under Fed. R. Civ., at 12(b)(6)).

Once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*, . . . [the ultimate decision becomes] . . . a pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007) (emphasis in original). "When opposing parties tell two different stories, one of which is blatantly

contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on the motion for summary judgment." *Id.* at 380.

### III. SUMMARY JUDGMENT EVIDENCE

Plaintiff, a convicted federal inmate, was housed in the Carter County Detention Center ("CCDC") from May 30, 2019, to December 13, 2019. (Doc. 66-2 ¶¶ 4–5.) At the time he arrived at the facility, Plaintiff weighed approximately 300 pounds and was 6'0" tall. (*Id*. ¶ 15.) On December 4, 2019, Plaintiff was written up on a disciplinary issue after allegedly disrespecting a female officer in C block. (*Id*. ¶¶ 6, 8.) The following day, the Disciplinary Board reviewed the charges and found Plaintiff guilty. (*Id*. ¶ 7.) As punishment, Plaintiff was given thirty days' confinement in D block, which is an adjustment center housing inmates with disciplinary issues. (Doc. 62-2 ¶ 4.) While he was in D block, Plaintiff's personal belongings were removed at 7:00 a.m. each morning and returned at 9:00 p.m. each evening. (*Id*. ¶ 7.) The only items not removed each day were Plaintiff's personal hygiene items. (*Id*.) The penological justification for moving an inmate to D block is to encourage an inmate to improve unacceptable behavior. (*Id*. at ¶¶ 7, 9.)

On December 5, 2019, officers attempted to transfer Plaintiff from C block to D block, but Plaintiff refused to handcuffed and moved. (*Id*. ¶ 3; Doc. 66-2 ¶¶ 10-11.) Lt. Ronnie Kent instructed officers to assemble a team to move Plaintiff, but first, Sgt. Norton and Officer Tipton went to Plaintiff's cell door without the team to ask him to move voluntarily. (Doc. 62-2 ¶¶ 5-6, 31.) Plaintiff again refused to voluntarily move. (*Id*. ¶5.)

An extraction team was assembled, and Officer Harris was assigned responsibility for the PepperBall gun, which is a non-lethal weapon containing balls that burst upon impact to release a pepper irritant. (Doc. 62-1 ¶¶ 5, 7.) The weapon can also be used for pain compliance, as the ball produces a stinging sensation if it directly strikes an individual. (Doc. 66-2 ¶ 13.) In this

case, Sgt. Norris instructed Harris that he could fire the PepperBall gun to obtain Plaintiff's compliance if Plaintiff continued to refuse commands. (Doc. 62-1 ¶ 9.)

Plaintiff's move to D block was recorded on video by a correctional officer who served as a part of the extraction team. (Doc. 62-2 ¶¶ 6–7, 14.) That video shows Sgt. Norton, the commanding officer, immediately outside of Plaintiff's cell instructing the inmates inside to "get on the ground." (Doc. 62-1 ¶ 10; Ex. B to Doc. 66-2.) All inmates complied except for Plaintiff, who instead of getting on the ground, walked up to the door. (Ex. B to Doc. 66-2.) Throughout this time, Sgt. Norton ordered Plaintiff to "get on the ground," and Plaintiff repeatedly refused. (*Id*.). Before the first shot was fired, Plaintiff stated, "[g]o ahead, shoot, shoot, shoot, shoot." (*Id*. ¶ 11.) Officer Harris fired one PepperBall shot at Plaintiff through the pie flap, and the PepperBall hit Plaintiff in the upper leg. (Doc. 62-1 ¶ 11.) Once Officer Harris fired, Johnson remained close to the pie flap and said "keep shootin', that shit don't hurt" before Officer Harris fired five more PepperBalls into Plaintiff's leg. (*Id*. ¶ 12; Ex. B to Doc. 66-2.) At this point, Plaintiff partially complied by moving away from the cell door and getting on his knees. (Doc. 62-1 ¶ 13.) Officer Harris did not fire any more PepperBall shots. (*Id*. ¶ 14; Ex. B to Doc. 66-2.)

When Plaintiff got on his knees, officers opened the cell door and entered the cell. (Doc. 62-1 ¶¶ 13–16.) Officers put Plaintiff face-first on the ground to handcuff him. (*Id*. ¶ 16; Doc. 62-2 ¶ 14-15; Ex. B to Doc. 66-2.) After Plaintiff was handcuffed, Officer Harris held one of Plaintiff's legs and began pulling him, which prompted Plaintiff to complain and threaten Officer Harris. (Doc. 62-1 ¶ 19; Doc. 62-2 ¶ 17; Ex. B to Doc. 66-2.) Plaintiff stated he could walk on his own, and Officer Tipton and another officer helped Plaintiff to his feet. (Doc. 62-2 ¶ 17; Ex. B to Doc. 66-2.) As soon as Plaintiff was out of his cell, he lunged at Officer Harris, and the

5

officers holding him moved him momentarily to the wall before walking Plaintiff to D block. (Doc. 62-1 ¶ 20; Doc. 62-2 ¶ 18; Ex. B to Doc. 66-2.)

As Plaintiff was escorted to D block, he continued to be noncompliant and threatening. (Doc. 62-1 ¶ 21; Ex. B to Doc. 66-2.) He repeatedly stated that the officers did not hurt him with their "bullshit ass gun" that "don't hurt nobody." (Ex. B to Doc. 66-2.) Once Plaintiff entered his cell in D block, the officers holding Plaintiff walked him to the back corner of the cell and faced him toward the wall. (Doc. 62-2 ¶ 21.) Plaintiff continued to make threats toward Officer Harris, saying, for example, "I'll beat you, bitch"; "I have fifty years"; and "first chance I get, I'm going to tear your ass up." (*Id.* ¶ 22; Ex. B to Doc. 66-2.) The officers holding Plaintiff spoke to Plaintiff calmly, and, once Plaintiff began to calm down, Officer Tipton entered the cell and unlocked Plaintiff's handcuffs. (Doc. 62-2 ¶ 25.) Some officers continued to hold Plaintiff as other officers exited the cell. (*Id.* ¶ 26.) One of the officers holding Plaintiff can be seen straightening the back of Plaintiff's jail uniform. (Ex. B to Doc. 66-2.) As soon as Sgt. Norton determined it was safe to do so, the remaining officers promptly exited the cell. (Doc. 62-2 ¶ 28.)

Neither the video itself nor any still shot taken from the video after Plaintiff's move yields evidence of any sort of injury to Plaintiff's face or lip. (Ex. B to Doc. 66-2.) A short time after Plaintiff was moved to D block, Officer Tipton escorted jail nurse Deidra Ingram to Plaintiff's cell for a required medical check since Plaintiff had been shot with PepperBalls. (Doc. 62-2 ¶ 29; Doc. 66-2 ¶ 17.) Officer Tipton took photos of bruises on Plaintiff's upper left leg where he was shot. (*See* Doc. 66-2, at 14–15.) Nurse Ingram also checked Plaintiff's vital signs, which were fine. (*Id.* at 12.) Following the move, Officer Harris prepared an Incident Report that was sent to Sgt. McGinnis for review. (Doc. 62-1 ¶¶ 24–25.)

6

Case 2:20-cv-00099-TRM-CRW   Document 96   Filed 03/17/22   Page 6 of 16   PageID #: 495

Later the same day, Plaintiff refused to return his food tray through the pie flap. (Doc. 66-2 ¶ 18.) Once again, a team of officers was assembled to enter Plaintiff's cell in order to retrieve the food tray. (*Id.* ¶ 19.) This event was also videoed. (*Id.* ¶ 20; Ex. E to Doc. 66-2.) Plaintiff refused requests to put his food tray in the pie flap. (Doc. 66-2 ¶ 20; Ex. E to Doc. 66-2.) A team of officers entered the cell and handcuffed Plaintiff while removing the other two inmates from the cell and removing the food trays. (Doc. 66-2 ¶ 20.) Plaintiff was escorted out into the common area of D-block so that officers could move the other two inmates to a different cell, and Plaintiff was thereafter returned to his cell. (*Id.*) As he was returned to his cell, Plaintiff was smiling and speaking with an officer. (Ex. E to Doc. 66-2.)

Plaintiff continued to act disruptively in D block. On December 5, 2019, he allegedly threatened to spit on, throw urine on, and cut the throat of a female officer. (Doc. 66-2, at 29–31.) Plaintiff was released to the United States Marshals Service on December 13, 2019. (*Id.* ¶ 22.) Between the December 5, 2019, use of force up to the time of his transfer, Plaintiff submitted seven grievances to correctional staff and eight non-medical requests to medical staff. (*Id.* ¶ 23.) The CCDC uses a kiosk system, where inmates can contact officers or medical staff electronically by sending requests directly to the appropriate staff. (*Id.* ¶ 21.) Plaintiff submitted a total of eleven medical requests during his incarceration at the facility, the last of which was on October 19, 2019. (*Id.*) However, Plaintiff did not submit any requests to medical staff between December 5, 2019, and his release to the United States Marshals on December 13, 2019.

## IV. ANALYSIS

### A. Individual-Capacity Claims

Defendants claim the defense of qualified immunity as to the claims against them in their individual capacities. Qualified immunity protects governmental employees from individual,

7

civil liability as long as their conduct does not violate clearly established "constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An evaluation of qualified immunity requires the Court to conduct a three-pronged inquiry: (1) whether there was a constitutional violation; (2) whether the violated right was "clearly-established;" and (3) whether the official's actions were objectively unreasonable. *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999).

For a right to be clearly-established, "at the time of the officer's conduct, the law [must have been] sufficiently clear such that 'every reasonable official would understand what he is doing is unlawful.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Once qualified immunity has been pleaded by a defendant, the plaintiff bears the burden of rebutting the defense by showing both "that the challenged conduct violated a constitutional or statutory right, and that the right was so clearly established at the time of the conduct 'that every reasonable official would have understood that what he [was] doing violate[d] that right.'" *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014) (citing *Ashcroft*, 563 U.S. at 741). In short, it is a defense that protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

### 1. Excessive Force

Plaintiff's claim that he was subjected to excessive force implicates the Eighth Amendment's prohibition against cruel and unusual punishment. *Combs v. Wilkinson*, 315 F.3d 548, 556 (6th Cir. 2002). In determining whether a prison official has violated the Eighth Amendment's prohibition against excessive force, courts apply a two-part inquiry that is made up of subjective and objective components: (1) "whether force was applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing

8

harm"—the subjective component; and (2) whether the conduct, in context, is sufficiently serious to offend "contemporary standards of decency"—the objective component. *Hudson v. McMillan*, 503 U.S. 1, 6, 9 (1992).

The subjective prong requires consideration of the need for the use of force, the relationship between that need and the force used, the threat reasonably perceived by the official, and the extent of the injury. *Id.* at 7. To satisfy the objective component, an inmate need not prove a serious injury to demonstrate cruel and unusual treatment, but the extent of the injury may be probative of whether the force was plausibly "thought necessary" in the situation. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). However, "not every malevolent touch by a prison guard" gives rise to a federal claim, and *de minimis* uses of physical force that are not repugnant to the conscience do not violate the Eighth Amendment. *Id*. (quoting *Hudson*, 503 U.S. at 9). In fact, the good faith use of physical force in pursuit of a valid penological objective will rarely, if ever, violate the Eighth Amendment. *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986); *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981).

Plaintiff first claims that Officer Harris subjected him to excessive force by shooting him with PepperBalls. The record on this issue, however, is unambiguous that force was used only after Plaintiff actively resisted lawful orders, that he repeatedly threatened and taunted officers, and that the complained-of force stopped once Plaintiff partially complied. That is, no reasonable juror could view the video evidence and find that Officer Harris shot Plaintiff with the PepperBall gun maliciously and sadistically for the purpose of causing harm to Plaintiff. Moreover, a reasonable officer in Officer Harris' position could have believed that the decision to shoot Plaintiff was necessary to ensure the safety of the inmates in Plaintiff's cell and other

9

officers on the extraction team, as Plaintiff was visibly agitated and actively disobeying a lawful command to get on the floor.

Additionally, there is no proof that any injury to Plaintiff was sufficiently serious under the Eighth Amendment's objective component. The use of a non-lethal weapon on a resisting inmate that led only to a bruise is a minor injury insufficient to support a claim of excessive force. *See, e.g.*, *Cretacci v. Call*, 988 F.3d 860, 869 (6th Cir. 2021). Further, Plaintiff repeatedly told officers they had not hurt him (Ex. B to Doc. 66-2), he was checked by the jail nurse and determined to be fine, and he never requested medical attention related to the use of force (Doc. 66-1 ¶ 25; Doc. 66-2 ¶ 29; Doc. 64-1 ¶¶ 9–10).

Plaintiff also contends that Officer Tipton hit Plaintiff in the face, thereby busting his lip. The video evidence in this case establishes that the only time Officer Tipton could have injured Plaintiff during the events on December 5, 2019, is during the "take down" of Plaintiff on the floor to get him handcuffed in C block. (Ex. B to Doc. 66-2.) However, there is a clear penological justification for putting Plaintiff on the ground for safety of the officers and other inmates, and there is no evidence that Defendant Tipton (or any other Defendant) acted maliciously or sadistically to harm Plaintiff in doing so. *See Rafferty v. Trumbull Cnty., Ohio*, 915 F.3d 1087, 1094 (6th Cir. 2019). In fact, Plaintiff is shown talking consistently throughout the transfer and complains the entire time but makes no complaints of injury to his mouth or face. (Ex. B to Doc. 66-2.) There is no visible injury to Plaintiff's mouth or face in the video and screenshots taken therefrom. (*Id.*) Therefore, even if there was some sort of injury to Plaintiff, it was so minor so as not to be visible, and thus, not sufficiently serious.

Alternatively, a reasonable officer tasked with entering the cell as part of an extraction team could have believed that he was not using excessive force, especially where the video

recording shows no visible injury, no complaints by Plaintiff, and contains representations from Plaintiff that the force used had not hurt him. Defendants Harris and Tipton are therefore entitled to qualified immunity on this claim.

### 2. *Denial of Medical Care*

Plaintiff also alleges that Sgt. McGinnis denied him medical treatment following the use of force. The alleged denial of adequate medical care to a prisoner implicates the Eighth Amendment's prohibition against cruel and unusual punishment, which proscribes acts or omissions that produce an "unnecessary and wanton infliction of pain." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). An Eighth Amendment claim for the denial of adequate medical treatment is composed of two parts: (1) an objective component, which requires a plaintiff to show a "sufficiently serious" medical need; and (2) a subjective component, which requires the plaintiff to show the defendants acted with "deliberate indifference" to that need. *Farmer v. Brennan*, 511 U.S. 825, 834, 842 (1994).

To satisfy the objective component, a plaintiff must show a sufficiently serious medical need so that, if care were denied, it would result in unnecessary or wanton infliction of pain or pose a substantial risk of serious harm. *See Quigley v. Thai*, 707 F.3d 675, 681 (6th Cir. 2013); *Flanory v. Bonn*, 604 F.3d 249, 253 (6th Cir. 2010). Where treatment has been provided, and the allegation is that the medical treatment was inadequate, a plaintiff must show "care so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018) (citation and internal quotation marks omitted).

In order to meet the subjective requirement, an inmate must show more than negligence in failing to render adequate medical care. *See, e.g.*, *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir.

2008). Deliberate indifference is demonstrated only where "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference.'" *Id*. (quoting *Farmer*, 511 U.S. at 837).

Here, the evidence demonstrates that Plaintiff suffered, at most, a bruise and a minor lip injury from the non-lethal use of force used against him; that he was evaluated shortly after the use of force and determined to be fine; and that he repeatedly told officers that the PepperBall shots were useless, as they did not hurt him. Therefore, the Court finds that there is no evidence that Plaintiff had a serious medical need. Moreover, Plaintiff was seen by a jail nurse and cleared before Sgt. McGinnis received a copy of the Incident Report advising him of the use of force. Therefore, there is no evidence that McGinnis had any involvement in the decision whether to provide medical care to Plaintiff.

Additionally, Plaintiff could have contacted medical staff directly via a kiosk system at any point after the use of force, and, in fact, submitted eight non-medical requests to correctional staff. He did not, however, submit any medical requests between December 5, 2019, and his release to the United States Marshals on December 13, 2019. (Doc. 66-2 ¶¶ 22-23.) There is no evidence that Plaintiff had a serious medical need or that McGinnis was deliberately indifferent. Sgt. McGinnis is therefore entitled to qualified immunity on this claim.

### 3. *Free-Exercise Claim*

This Court also allowed Plaintiff to pursue a free-exercise claim against Sgt. McGinnis based on Plaintiff's allegation that McGinnis ordered staff to confiscate Plaintiff's religious materials, including his Quran and prayer blanket, between the hours of 7:00 a.m. and 11:00 p.m. (Doc. 19, at 43; Doc. 17, at 31.)

The Sixth Circuit has summarized the law in this area as follows:

> [W]here an inmate challenges prison policies under the Free Exercise Clause, Supreme Court precedent instructs us to follow the standard formulated in *Turner v. Safley* . . . ." *Id*. (citation omitted). "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 96 L.Ed.2d 64 (1987).
>
> "'To ensure that courts afford appropriate deference to prison officials,' the Supreme Court has 'determined that prison regulations alleged to infringe constitutional rights are judged under a "reasonableness" test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.'" *Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, 107 S. Ct. 2400, 96 L.Ed.2d 282 (1987)). "The *Turner* Court outlined four factors that are relevant in determining the reasonableness of a challenged prison regulation." *Spies v. Voinovich*, 173 F.3d 398, 403 (6th Cir. 1999). "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89, 107 S. Ct. 2254 (quoting *Block v. Rutherford*, 468 U.S. 576, 586, 104 S. Ct. 3227, 82 L.Ed.2d 438 (1984)). If there is not, "the regulation is unconstitutional, and the other factors do not matter." *Spies*, 173 F.3d at 403. The next three factors are balanced and considered together:
>
>> (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there are "ready alternatives" available "that fully accommodate the prisoner's rights at de minimis cost to valid penological interests."
>
> *Id*. (quoting *Turner*, 482 U.S. at 90–91, 107 S. Ct. 2254).

*Koger v. Mohr*, 964 F.3d 532, 543 (6th Cir. 2020).

Here, the Disciplinary Board, not Sgt. McGinnis, made the decision to remove Plaintiff's personal belongings for a period of time each day. (Doc. 64-1 ¶ 16; Doc. 66-2 ¶7.) Therefore, the evidence demonstrates that Sgt. McGinnis is not liable for any allegedly unconstitutional deprivation of Plaintiff's religious materials.

13

Moreover, in *Beard v. Banks*, the Supreme Court found that a policy restricting inmates' First Amendment right of access to newspapers, magazines, and photographs for inmates and allowing inmates to graduate out of the segregation through compliance "to motivate better behavior" satisfied *Turner*'s requirements. 548 U.S. 521, 531 (2006). In *Beard*, the deprivation was at least 90 days for all inmates and could be longer depending on the inmate's conduct. *Id.* at 525. Here, Plaintiff had all of his belongings returned to him each night, and he was transferred to the United States Marshals after only a few days in lockdown. (Doc. 66-2 ¶ 7; Doc. 64-1 ¶¶ 14–16.) Accordingly, here, as in *Beard*, the inmate was deprived of a constitutional right for a brief period in order to improve inmate behavior. (Doc. 66-2 ¶ 7.) Therefore, the penological justification in this case is sufficient to satisfy the *Turner* standard for the same reason there was no constitutional violation in *Beard*.

Additionally, a reasonable officer could have believed he was not violating Plaintiff's First Amendment rights when he was following orders of the Disciplinary Board, and there was no clearly established law that would have placed a reasonable officer on notice that following these orders would violate Plaintiff's constitutional rights. Further, there is no clearly established law that would have placed it beyond question that removing an inmate's personal belongings for several hours a day to improve inmate behavior would constitute a constitutional violation of an inmate on lockdown. Accordingly, Sgt. McGinnis is entitled to qualified immunity on this claim as well.

### B. Official-Capacity Claims

Out of an abundance of caution, the Court considers Plaintiff's allegations against Defendants in their official capacities as well. A governmental entity cannot be held liable for the actions of any of its officers if the officers did not violate a constitutional right. *City of Los*

14

Case 2:20-cv-00099-TRM-CRW   Document 96   Filed 03/17/22   Page 14 of 16   PageID #: 503

*Angeles v. Heller*, 475 U.S. 796, 799 (1986). As the Court has already determined, Plaintiff has failed to prove that any Carter County official committed any underlying constitutional violation. Accordingly, Defendant Carter County cannot be held liable for the actions or inactions its personnel. *Id*.

Moreover, a municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 694 (1978). Instead, a local governmental unit may be liable for civil damages in a § 1983 action only when the execution of a governmental policy or the toleration of a custom causes the deprivation of a constitutionally protected right. *Doe v. Claiborne Cnty.,* 103 F.3d 495, 507 (6th Cir. 1996) (citing *Monell*, 436 U.S. at 691). A policy or custom may be established by demonstrating: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations. *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citation omitted).

> Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality. Similarly, an act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.

*Bd. of County Commr's v. Brown*, 520 U.S. 397, 403–04 (1997) (citations omitted).

As set forth above, Plaintiff has not demonstrated that he was subjected to excessive force in violation of the Eighth Amendment, and he has not demonstrated that the County had any policy or practice of permitting excessive force or that a facially constitutional policy was implemented in an unconstitutional manner with the approval of County policymakers. (Doc.

66-2 ¶ 26; Ex. F to Doc. 66-2.) Further, the record demonstrates that Defendants had all the training required by Tennessee law to be correctional officers certified by the Tennessee Corrections Institute, and there is no basis to find that the County failed to train on the use of force in the correctional setting. (Doc. 62-1 ¶ 2; Doc. 62-2 ¶ 2; Doc. 64-1 ¶ 2; Doc. 66-2 ¶ 2.) Similarly, the evidence is insufficient to support a denial-of-medical-care claim against any named Defendant, and therefore, Plaintiff has not demonstrated an underlying constitutional violation with regard to this issue. Rather, the evidence demonstrates that inmates have direct access to medical staff through a kiosk system. (Doc. 66-2 ¶ 21.) Accordingly, there is no evidence of a policy or practice of denying inmates access to medical care. Finally, the evidence is insufficient to support Plaintiff's denial-of-religious-freedom claim. Absent a constitutional violation, the County is entitled to summary dismissal.

## V. CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment (Doc. 62, 64, 66) are **GRANTED**, and this action will be **DISMISSED**. All remaining motions (Docs. 83, 91, and 92) are **DENIED** as moot.

The Court hereby **CERTIFIES** that any appeal from this order would not be taken in good faith. Therefore, should Plaintiff file a notice of appeal, this Court will **DENY** Plaintiff leave to appeal *in forma pauperis*. *See* 28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24.

**AN APPROPRIATE JUDGMENT WILL ENTER**.

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**